UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHRISTOPHER WALLACE,<br><br>                              Plaintiff,<br><br>               -v.-<br><br>CITY OF NEW YORK, DEPARTMENT<br>OF EDUCATION,<br><br>                              Defendant. | 20 Civ. 1424 (KPF)<br><br>**OPINION AND ORDER** |

KATHERINE POLK FAILLA, District Judge:

Plaintiff Christopher Wallace, a former paraprofessional with the New York City Department of Education ("DOE" or "Defendant"), brings suit against DOE for alleged violations of the Family Medical Leave Act of 1993 (the "FMLA"), 29 U.S.C. §§ 2601-2654.  In brief, Plaintiff asserts claims of FMLA retaliation and interference stemming from his termination from Public School 6 Corporal Allan F. Kivlehan School ("P.S. 6"), a public elementary school in Staten Island operated by DOE.  Pursuant to Federal Rule of Civil Procedure 56, Defendant now moves for summary judgment on the grounds that Plaintiff (i) did not work enough hours in the relevant timeframes to qualify for FMLA protection and (ii) has otherwise failed to establish claims of FMLA retaliation or interference.  Because the Court agrees with Defendant's first argument, it grants the motion in full.

## BACKGROUND[1]

### A.    Factual Background

#### 1.    Plaintiff's Employment as a Paraprofessional with DOE

Plaintiff was employed as a DOE paraprofessional from 2013 to 2018. (Def. 56.1 ¶ 1).  He began his employment at DOE as a substitute paraprofessional, in which position he provided one-on-one support to students at various schools for the purpose of assisting teachers with the

---

[1]    The facts set forth in this Opinion are drawn from the parties' submissions in connection with their submissions on Defendant's summary judgment motion, including Defendant's statement of undisputed material facts pursuant to S.D.N.Y. Local Civil Rule 56.1 ("Def. 56.1" (Dkt. #41)); Plaintiff's Rule 56.1 counterstatement ("Pl. 56.1" (Dkt. #51)); and Defendant's response to Plaintiff's Rule 56.1 counterstatement ("Def. 56.1 Reply" (Dkt. #59)).  The Court also draws from various exhibits attached to the declarations submitted by the parties, which are cited using the convention "[Name] Decl., Ex. [ ]."  Certain exhibits appended to the parties' declarations consist of documents exchanged by the parties during discovery.  For those exhibits, the Court's pinpoint citations refer to the document's Bates-stamp number.

The Court notes that the parties have included excerpts of deposition testimony as exhibits to their respective declarations.  This mode of presentation violates Rule 5.B of the Court's Individual Rules of Practice in Civil Cases, which provides that, "[w]here parties rely on deposition testimony, they should not include excerpts of deposition transcripts as exhibits, but rather should include (only once) the entire deposition transcript as an exhibit."  The Court has made use of the excerpts available to it on this motion, but urges the parties to be more mindful of the Court's rules in future cases.  When citing to these deposition excerpts, the Court uses the convention "[Name] Dep."

Citations to a party's Rule 56.1 statement incorporate by reference the documents cited therein.  *See* Local Civil Rule 56.1(d).  Where facts stated in a party's Rule 56.1 statement are supported by testimonial or documentary evidence, and denied with only a conclusory statement by the other party, the Court finds such facts to be true.  *See id.* at 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a corresponding numbered paragraph in the statement required to be served by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent ... controverting any statement of material fact[ ] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").  Additionally, to the extent that Plaintiff purports to dispute facts in Defendant's Rule 56.1 statement with inadmissible evidence or with evidence that does not support the proposition for which it is advanced, the Court finds such facts to be true.

For ease of reference, the Court refers to Defendant's opening brief as "Def. Br." (Dkt. #39); Plaintiff's opposition brief as "Pl. Opp." (Dkt. #49); and Defendant's reply brief as "Def. Reply" (Dkt. #60).

maintenance of their classrooms.  (Pl. 56.1 ¶ 91; Wallace Dep. 11:1-12:8).

Plaintiff was a substitute paraprofessional for nearly four years, until May 21,

2017.  (Pl. 56.1 ¶ 91).  Plaintiff estimates that as a substitute paraprofessional

between September 2016 and May 2017, he worked on average 31 hours per

week.  (*Id.* at ¶¶ 77-78, 92).

Thereafter, from May 22, 2017, until the last week of June 2017, Plaintiff

served as a full-time paraprofessional at P.S. 20 in Staten Island's Port

Richmond neighborhood.  (Pl. 56.1 ¶ 93).  As a paraprofessional at P.S. 20,

Plaintiff was assigned to assist a particular student with anger management

issues in the classroom.  (Wallace Dep. 12:9-13:8).  Plaintiff estimates that as a

paraprofessional at P.S. 20, he continued to work an average of 31 hours per

week.  (Pl. 56.1 ¶¶ 82, 94).

Plaintiff changed schools from P.S. 20 to P.S. 6 in September 2017.  (Def.

56.1 ¶ 2; Pl. 56.1 ¶ 95).  At P.S. 6, Plaintiff was assigned to an eight-year-old,

severely disabled, wheelchair-bound student ("Student A") in Jacqueline

Deforest's classroom.  (Def. 56.1 ¶ 15; Pl. 56.1 ¶ 107).  Plaintiff's

responsibilities included transporting Student A to various locations within the

school; picking him up and dropping him off at the bus stop before and after

school; and transferring him, as needed, between his mechanical and

motorized wheelchairs, his desk chair, and the toilet.  (Def. 56.1 ¶¶ 16-17).  As

in his previous positions, Plaintiff estimates that he worked on average 31

hours per week at P.S. 6.  (Pl. 56.1 ¶¶ 10, 89, 97).

In addition to the responsibilities described above, Plaintiff was charged with ensuring Student A's safety and well-being at the school.  (Def. 56.1 ¶ 18). To this end, P.S. 6's administrative handbook provided that "all Paraprofessionals must be with their student(s) and/or class at all times, except [during] the Paraprofessionals' lunch."  (Yaqoob Decl., Ex. C ("P.S. 6 Administrative Handbook") at HAND000018).  Plaintiff was to take special care to monitor Student A while in the schoolyard because of Student A's tendency to drive his motorized wheelchair at a rapid speed while in the yard.  (Def. 56.1 ¶ 20).  Reflecting on Student A's need for close supervision, Plaintiff testified that he was aware of one occasion when Student A ran over another student with his wheelchair in the schoolyard.  (Wallace Dep. 40:15-41:3).

### 2.    Policies Governing Paraprofessionals at P.S. 6

P.S. 6 expects "all personnel [to] strive for excellent attendance throughout the school year[.]"  (P.S. 6 Administrative Handbook HAND000005). The official school hours for staff were: Monday, 8:15 a.m. to 3:55 p.m.; Tuesday, 8:15 a.m. to 3:50 p.m.; and Wednesday through Friday, 8:15 a.m. to 2:35 p.m.  (Def. 56.1 ¶ 10).  The school's attendance policy explains that (i) "[s]taff lateness imposes undue hardship on the school by requiring teachers to cover classes and/or rearrange schedules" and (ii) "[a]ll staff members are to be present for work in their assigned location at 8:15 a.m.  If you are not at your assigned location by the start of your official hours you are considered late."  (*Id.* at ¶ 6).  The policy further warns that, "[i]f late more than 3 times, a

conference will be held with the staff member and may result in disciplinary action." (*Id.* at ¶ 7).

To keep track of school staff's time at work, P.S. 6 used an in-or-out timecard system. (Pl. 56.1 ¶ 99). Under this system, employees would flip their timecard to the green side to signify their presence in the school building and would flip their timecard to the red side to signify that they were outside of the building. (*Id.*). If a paraprofessional was unable to work on a particular day, that paraprofessional was required to alert the school administration and arrange for a substitute for that day. (Def. 56.1 ¶ 11). If a paraprofessional had to leave school early, be it for official business or a personal matter, the paraprofessional was required to sign out using the staff sign-out book, noting the time, destination, and reason for the departure. (*Id.* at ¶ 12). Barbara Weaver, P.S. 6's payroll secretary, testified that it was her responsibility to record absences and instances of lateness into the school's electronic timekeeping system. (Weaver Dep. 9:18-10:20).

In addition to outlining the staff attendance policy, P.S. 6's administrative handbook provided that staff were prohibited from eating or drinking (except water) during instructional time. (Def. 56.1 ¶ 8).[2] For lunch, paraprofessionals at P.S. 6 were entitled to a 50-minute break, during which break they were fully relieved of their job responsibilities. (*Id.* at ¶ 9; Pl. 56.1 ¶ 108). Typically, while Plaintiff was on his lunchbreak, another

---

[2] Plaintiff has testified that this rule was not strictly enforced and recalls several instances when school employees, including another paraprofessional, ate food during instructional hours. (*See* Wallace Dep. 27:3-16).

paraprofessional — either Tara Joyce or Steven Boyars — would assume responsibility for watching Student A.  (Pl. 56.1 ¶¶ 114-115).

The parties offer conflicting testimony regarding the proper procedures at P.S. 6 for paraprofessionals to alter their lunch schedules.  According to P.S. 6's principal, Elizabeth Waters, when a paraprofessional needed to deviate from his or her regularly scheduled lunch period, the paraprofessional was required to contact the main office to arrange for alternative supervision of the assigned student.  (Waters Dep. 21:11-22:12).  However, Boyars and Joyce both testified that if Plaintiff's duties to assist Student A forced him to take a late lunch, Plaintiff was permitted to return from his lunch break later than his usually scheduled time because other paraprofessionals could supervise Student A. (Joyce Dep. 15:4-7; Boyars Dep. 21:23-22:24).  Furthermore, there were typically three or four aides to help supervise students in the schoolyard during lunch.  (Pl. 56.1 ¶ 117).

### 3.    Plaintiff's Disciplinary Record at P.S. 6

Plaintiff received three disciplinary letters from Principal Waters relating to his attendance record at P.S. 6.  In the first letter, dated November 28, 2017, Plaintiff was informed of the school's concern about his absences and repeated lateness during the months of September and October 2017.  (Yaqoob Decl., Ex. H ("November 28, 2017 Letter-to-File")).  This letter memorialized a November 8, 2017 meeting at which Principal Waters and Assistant Principal Dennis Ford presented Plaintiff with records of his absences and lateness during this period.  (*Id.*).  The letter reflected that between September 14, 2017,

6

and October 30, 2017**,** Plaintiff was absent four times, left early on four occasions, and arrived late once.  (*Id.*).[3]  As recounted in the letter, Plaintiff explained at the meeting that, "I have had real emergencies and I have been sick[,] and I promise you I will definitely improve my attendance."  (*Id.*).

The letter reflects that, following the meeting, Principal Waters determined that Plaintiff's "absence record is excessive in light of the fact that you have been absent 4 days in a 6 week period."  (November 28, 2017 Letter-to-File).  Principal Waters also concluded that Plaintiff "left early on 4 occasions," and noted to Plaintiff that "of the 4 days you were absent, 3 of the days were on either a Monday or Friday thereby extending your weekends." (*Id.*).  Principal Waters urged Plaintiff that "[y]our attendance must improve," and reiterated that "[y]our duties and responsibilities as a 1:1 paraprofessional require that you are present at work each day for your 1:1 student" and that "[w]hen you are absent or late, this disrupts the continuity of instruction for

---

[3]     DOE's electronic timekeeping records include entries that correspond to each of the attendance irregularities listed in the November 28, 2017 Letter-to-File.  (*See* Yaqoob Decl., Ex. Q ("Time and Attendance Records") at TIME000001).  Plaintiff, on the other hand, denies that he had excessive lateness and absences between September and October of 2017.  As support for this denial, Plaintiff explains that, "DOE did not maintain accurate or reliable time and attendance records as required by the Regulations of the Chancellor" and, further, that "DOE's records show that Plaintiff was late only twice at P.S. 6," whereas the school's administrative handbook defines excessive lateness as being late three times.  (Pl. 56.1 ¶¶ 21-24).

Plaintiff is correct that only two entries in DOE's timekeeping records contain a designation of "lateness."  However, other entries are designated as "Absence Unauth" or "Absence wo Pay," which the Court understands to suggest unapproved absences or tardiness.  (*See* Time and Attendance Records TIME000001).  Furthermore, Plaintiff does not affirmatively claim that he actually worked on any of the specific days that he was marked as absent in the November 28, 2017 Letter-to-File.  In any event, setting aside the accuracy of the timekeeping records, Plaintiff does not dispute that the November 28, 2017 Letter-to-File accurately reflects what was discussed and presented to Plaintiff at the November 8, 2017 meeting.

your 1:1 student." (*Id.*).  The letter concluded with a warning that "excessive absenteeism or lateness may lead to further disciplinary action including a suspension without pay and termination of your employment." (*Id.*).

The second letter, dated January 10, 2018, concerned Plaintiff's late arrival to the school on November 29, 2017.  (Yaqoob Decl., Ex. I ("January 10, 2018 Letter-to-File")).  This letter documented a December 5, 2017 meeting, during which Plaintiff, Principal Waters, and Assistant Principal Ford discussed Plaintiff's 11:20 a.m. arrival at the school on November 29, 2017, or three hours and five minutes past his official start time.  (*Id.*).  According to the letter, Plaintiff explained at this meeting that, "I overslept.  I have four jobs and I was just exhausted." (*Id.*).  Based on this representation, Principal Waters concluded in the letter "that on November 29, 2017, you arrived to school 3 hours and 15 [*sic*] minutes late because you overslept." (*Id.*).[4]  Principal Waters further explained that, "[a]rriving to work more than three hours late is unacceptable" and noted that, "[t]his is your second disciplinary meeting in which time and attendance policies have been reviewed with you." (*Id.*).  Principal Waters concluded the letter by informing Plaintiff that this "misconduct may lead to further disciplinary action which could lead to your termination." (*Id.*).

---

4       DOE's timekeeping records do not reflect Plaintiff's late arrival on November 29, 2017.  (*See* Time and Attendance Records TIME000001).  Plaintiff mounts the same objections to Defendant's allegations regarding the January 10, 2018 Letter-to-File as he did to Defendant's allegations regarding the November 28, 2017 Letter-to-File.  (*See* Pl. 56.1 ¶¶ 26-29).  Here too, the Court does not interpret Plaintiff's generalized objection to DOE's timekeeping practices as refuting the contents of the January 10, 2018 Letter-to-File, as Plaintiff has not specifically refuted any of the details contained therein.

8

The third letter, dated March 12, 2018, addressed Plaintiff's "continued failure to follow time and attendance procedures" during the months of January and February 2018. (Yaqoob Decl., Ex. J ("March 12, 2018 Letter-to-File") at DEF000009). The letter described a March 9, 2018 meeting between Plaintiff, Principal Waters, Assistant Principal Ford, and Arthur Avila, a union representative. (*Id.*). This meeting focused on three days on which Plaintiff allegedly violated school procedures. *First*, on January 30, 2018, Plaintiff arrived to work at 9:07 a.m., or 52 minutes past the school's official start time. (*Id.*).[5] At 9:30 a.m. that same day, Plaintiff picked up breakfast from a delivery person in the school lobby and proceeded to eat in the classroom during instructional time. (*Id.*). *Second*, on February 2, 2018, Plaintiff was absent from work, but did not arrange for a substitute or inform anyone at the school of his whereabouts. (*Id.*).[6] According to the letter, on February 2, 2018, Ms. Weaver called Plaintiff's home and spoke to his father, who was unaware of Plaintiff's location. (*Id.*). *Third*, on February 5, 2018, Plaintiff left work sick at 10:30 a.m., but failed to include his signature or the time of his departure in

---

[5]     DOE's timekeeping records include an entry for January 30, 2018, indicating that Plaintiff arrived 52 minutes late to school. On his own account, Plaintiff recalls arriving to school on January 30, 2018, sometime between his regularly scheduled start time of 8:15 a.m. and 9:00 a.m. (Wallace Dep. 22:17-23:9).

[6]     DOE's timekeeping records include an entry for February 2, 2018 with a designation of "Absence Unauth." Plaintiff acknowledges that he was absent on that day, but he disputes that he did not attempt to contact the school to communicate his absence. (Pl. 56.1 ¶¶ 33, 156). To substantiate his attempt to contact the school on this day, Plaintiff includes as an exhibit on this motion a record of a phone call, of two minutes and 28 seconds in duration, to the school's main phone number. (*See* Clark Decl., Ex. 17; *see also* Weaver Dep. 8:20-22 (confirming P.S. 6's telephone number)).

the sign-out book. (*Id.*).[7]  The union representative, speaking on Plaintiff's behalf, explained that Plaintiff took responsibility for the breakfast order, as he was "running late and was hungry since he didn't have breakfast." (*Id.*).  With respect to the unauthorized absence on February 2, 2018, the union representative noted that Plaintiff did in fact call the school and leave a message on the school's answering machine. (*Id.*).  Lastly, regarding the deficient entry in the sign-out book on February 5, 2018, the union representative said that Plaintiff had "no ill intent" and that because Plaintiff "never received a [P.S. 6 administrative] handbook … he was unaware of the proper procedure." (*Id.*).

Principal Waters concluded in the third letter that Plaintiff had violated school policy in each of these instances and declined to credit Plaintiff's claim that he was ignorant of school policy because he had previously signed and dated the Chancellor's Regulations and Administrative Handbook form. (March 12, 2018 Letter-to-File DEF000009).[8]  Of note, Principal Waters made specific findings regarding each event discussed in the March 8, 2018 meeting. She found that (i) on January 30, 2018, after arriving 52 minute late, Plaintiff left his student unattended in the classroom to retrieve his breakfast and then ate in the classroom (*id.*); (ii) on February 2, 2018, Plaintiff did not properly

---

[7]     DOE's timekeeping records include an entry for February 5, 2018, designated as "Med Cert Sick."  Plaintiff testified that Assistant Principal Ford told him to "please leave the office, I will sign for you," because he was visibly ill. (Wallace Dep. 59:6-15).

[8]     Plaintiff signed and dated the Chancellor's Regulations and Administrative Handbook form on September 15, 2017. (Yaqoob Decl., Ex. G).  With his signature, Plaintiff affirmed that he had read the Chancellor's Regulations and received the Administrative Handbook. (*Id.*).

10

report his absence (*id.* at DEF000010); and (iii) on February 5, 2018, Plaintiff did not properly sign out (*id.*).  For Plaintiff's "continued violation of school policy and procedures," he was suspended without pay for three days.  (*Id.*).[9] The letter ended with the warning that "the above violations may lead to a suspension without pay and termination of your employment."  (*Id.*).

### 4.   Plaintiff's Requests for FMLA Leave

During Plaintiff's employment at P.S. 6, Plaintiff's mother was intermittently hospitalized with ovarian cancer and occasionally required care at home.  (Pl. 56.1 ¶¶ 123-124).  To help care for his mother, Plaintiff requested to take FMLA leave from P.S. 6 on two occasions: first in mid-February 2018, and again on March 19, 2018.  (Def. 56.1 ¶¶ 35-37, 41; Pl. 56.1 ¶¶ 127, 134).

Plaintiff testified that he was first made aware of the possibility of seeking FMLA leave by Ms. Weaver in or around December 2017 or January 2018, and that Ms. Weaver provided him with an FMLA form in or around late February 2018 or early March 2018.  (Pl. 56.1 ¶ 125).  Among the information contained in this form was the requirement that only employees who had worked 1,250 hours in the preceding 12 months were entitled to take FMLA leave.  (Def. 56.1 ¶ 39).

According to Plaintiff, sometime in mid-February 2018, he approached Principal Waters and asked, "Am I allowed to apply for FMLA?"  (Def. 56.1 ¶ 35; Pl. 56.1 ¶ 127).  Plaintiff indicated that he wished to take FMLA leave

---

[9]     Plaintiff disputes the stated rationale for his suspension.  (Pl. 56.1 ¶ 46).

immediately, but did not specify in his request when or for how long he wanted to take leave. (Def. 56.1 ¶¶ 37, 42). Principal Waters responded by telling Plaintiff, "No, you haven't been working long enough." (*Id.* at ¶ 36).

The circumstances surrounding Plaintiff's second request for FMLA leave are contested. Both parties agree that Plaintiff returned to work on March 19, 2018, following the three-day suspension that was levied upon him in the March 12, 2018 Letter-to-File. (Def. 56.1 ¶ 48).[10] But their accounts diverge with respect to what happened that day. On Defendant's version of events, Plaintiff arrived at work at 8:39 a.m. — 24 minutes late. (Def. 56.1 ¶ 48). Then, around lunchtime, Principal Waters received a call asking her to come to the schoolyard because Student A was "unsupervised, and he was racing, zipping around in his motorized wheelchair." (Waters Dep. 29:2-6). In response to this call, Principal Waters went to the schoolyard and observed Student A "going around very fast … and nobody was with him." (*Id.* at 29:15-17). When Plaintiff returned to the schoolyard after his lunch, Principal Waters was there waiting for him and told Plaintiff that he was late and that he needed to supervise his student. (*Id.* at 31:15-23). Principal Waters then returned to the main office, and was surprised to see that Plaintiff had gone to the office as well, because he had once again left his student unsupervised. (*Id.* at 33:15-21). Plaintiff, feeling disrespected, signed out and left the school. (Def. 56.1 ¶¶ 55, 58).

---

[10]    Plaintiff was scheduled to return from his three-day suspension on March 16, 2018, but was absent from school that day. (Def. 56.1 ¶ 47).

Plaintiff tells a different version of the events of March 19, 2018.  To begin, Plaintiff disputes that he arrived at school late that day because the time records do not include an entry reflecting this lateness.  (Pl. 56.1 ¶ 48).  He also provides additional context concerning what happened at lunch, when Defendant claims Student A was left unsupervised.  Plaintiff says that he began his lunch break 10 to 15 minutes later than scheduled because he had been tending to Student A, who had soiled himself in the bathroom.  (*Id.* at ¶ 129).  Plaintiff notified Deforest, Joyce, and Boyars that he needed extra time for his lunch break (*id.* at ¶ 131), yet returned from lunch at 11:41 a.m. — only one minute after the end of his regularly scheduled break (*id.* at ¶ 130).  Plaintiff maintains that Student A was supervised by other DOE employees, including Boyars and lunch aides, at all times while he was in the schoolyard.  (*Id.* at ¶¶ 52-53, 132).  Upon returning to the schoolyard, Plaintiff was approached by Principal Waters, who asked him, "Why are you not back in time?"  (Wallace Dep. 41:21-42:3).  Feeling harassed, Plaintiff went to the main office to sign out from the school.  (*Id.* at 42:5-19).  In the office, Plaintiff asked Ms. Weaver about handing in his FMLA form, to which request Principal Waters interjected and told Plaintiff, "No, you have to be working for a full calendar year."  (Pl. 56.1 ¶  134; *see also* Def. 56.1 ¶ 41).  According to the sign-out book, Plaintiff left the school at 12:15 p.m. and listed "medical leave (family)" as the reason for his departure.  (Pl. 56.1 ¶ 135).

### 5.    The OSI Investigation and Plaintiff's Termination

On March 20, 2018, Plaintiff was put on an indefinite leave of suspension, without pay, pending an investigation into his conduct the preceding day.  (Def. 56.1 ¶ 59).  The following day, DOE's Office of Special Investigations ("OSI") received a referral from the Special Commissioner of Investigation, concerning Plaintiff's conduct on March 19, 2018.  (Def. 56.1 ¶ 60; *see also* Yaqoob Decl., Ex. L ("OSI Investigative Report")).

The OSI issued its findings in a series of reports, which culminated in a final report, dated June 6, 2018, that found Plaintiff had exhibited poor judgment in handling the events of March 19, 2018.  (OSI Investigative Report). Notably, the first two reports differed from the final report in that they did not find that Plaintiff had exercised poor judgment, but rather concluded that the allegations that Plaintiff had committed time abuse were unsubstantiated.  (Pl. 56.1 ¶¶ 136, 140).[11]

The first report was issued on May 30, 2018, and contained a closing memorandum indicating that the allegations of time abuse against Plaintiff for his conduct on March 19, 2018, were unsubstantiated.  (Pl. 56.1 ¶ 136). Notwithstanding the report's ultimate conclusion, the OSI determined that Plaintiff "arrived 24 minutes late for work and returned 18 minutes late from

---

[11]    Plaintiff filed the materials relating to the OSI's two previous reports and closing memoranda under seal, pursuant to the terms of the operative protective order entered into by the parties.  (*See* Dkt. #24 (protective order); Dkt. #53 (sealing order)).  The Court does not redact its discussion of these sealed materials, as this Opinion refers only to the portions thereof that have been disclosed in publicly filed submissions on this motion.

14

lunch on March 19, 2018" and recommended that "Principal Waters take the disciplinary action she deems appropriate[.]"  (Def. 56.1 Reply ¶ 136).  After receiving the May 30, 2018 report, Principal Waters emailed Lisa Becker, a DOE attorney, to express her "concern[] with the findings of the report" because she "felt that the investigator missed a lot."  (Pl. 56.1 ¶¶ 138-139).  Principal Waters testified that she believed the investigator had missed "[t]he major component, that the child was not supervised, a multiple handicapped child in a wheelchair that was not supervised."  (Waters Dep. 46:4-10).

The second report, issued on June 4, 2018, contained a closing memorandum that also found the allegations of time abuse against Plaintiff to be unsubstantiated.  (Pl. 56.1 ¶ 140).  Just as with the prior report, the June 4, 2018 report affirmed that Plaintiff "arrived 24 minutes late for work and returned 18 minutes late from lunch on March 19, 2018," and recommended that "Principal Waters take the disciplinary action she deems appropriate[.]"  (Def. 56.1 Reply ¶ 140).  After receiving the June 4, 2018 report, Principal Waters again contacted Ms. Becker via email because she still "had concerns about the major piece being missed within the investigation." (Pl. 56.1 ¶ 142).

The OSI issued a third and final report, on June 7, 2018, which also included a closing memorandum.  (*See* OSI Investigative Report; Pl. 56.1 ¶ 144).  Unlike the two previous closing memoranda, the third memorandum concluded that Plaintiff had "exhibited poor judgment by failing to notify the school that he would be arriving late to work and returning late from lunch on

March 19, 2018, which prevented the school from making the appropriate accommodations to ensure that Student A was properly supervised." (Def. 56.1 ¶ 144). The OSI, yet again, found that Plaintiff had arrived at school 24 minutes late on the morning of March 19, 2018, as confirmed by the "copy of Mr. Wallace's timecard for March 19, 2018, which indicates that Mr. Wallace clocked into work at 8:39 a.m. when he arrived that day." (OSI Investigative Report at DEF000021). Just like the two previous reports, the June 7, 2018 report found that despite his late arrival, Plaintiff did not commit time abuse on March 19, 2018. (*Id.*).

Following the issuance of the final OSI report, Principal Waters met with Plaintiff and Lillian Kohler, a union representative, on June 19, 2018, to discuss the report's findings. (Def. 56.1 ¶ 65). At the meeting, Principal Waters reiterated the report's finding that Plaintiff had failed to notify the school of his late arrival to work and late return from lunch on March 19, 2018, and that his conduct had prevented the school from making appropriate accommodations for Student A. (*Id.* at ¶ 66). Principal Waters further noted that on March 19, 2018, Plaintiff had only just returned from a three-day suspension that had been levied for his previous time and attendance issues. (*Id.* at ¶ 67). In response, Plaintiff asked that the record reflect that "[t]here was an illness of a family member. That week my mother was re-diagnosed with cancer and also I would like my job back. If you don't [want] me in your school then reassign me. I would like to start working again." (*Id.* at ¶ 68).

16

By letter dated June 25, 2018, Plaintiff was informed of his termination from DOE, effective immediately.  (Yaqoob Decl., Ex. O ("June 25, 2018 Termination Letter") at DEF000027).  In this letter, Principal Waters reiterated that Plaintiff "exercised poor judgment when [he] failed to notify the school that [he]  would be arriving late to work and returning late from lunch on March 19, 2018, which prevented the school from making the appropriate accommodations for [his] assigned 1:1 student, who is wheelchair bound." (*Id.* at DEF000026).  She also said that she "observed [Plaintiff's] 1:1 student in the schoolyard in his wheelchair riding around the schoolyard without [his] supervising him." (*Id.*).  Further, Principal Waters mentioned Plaintiff's previous disciplinary issues, including his letters to file for time and attendance issues, which had resulted in a three-day suspension without pay.  (*Id.*).

Plaintiff filed a grievance challenging his termination.  (Def. 56.1 ¶¶ 73-74).  On April 12, 2019, a grievance meeting was held, at which Plaintiff was accompanied by a union representative.  (*Id.* at ¶ 73).  The decision resolving Plaintiff's grievance detailed the arguments underpinning Plaintiff's challenge to his termination, as well as the school administration's progressive discipline related to Plaintiff's attendance and lateness issues.  (*See* Yaqoob Decl., Ex. P ("May 15, 2019 Grievance Decision") at DEF000001-DEF000002).  The decision concluded that the administration's decision to terminate Plaintiff "was based on good and sufficient reason and was made after giving this matter due consideration[.]" (*Id.* at DEF000003).

### B.     Procedural Background

Plaintiff initiated this action with the filing of the Complaint on February 19, 2020.  (Dkt. #1).  On April 27, 2020, Defendant filed a pre-motion letter seeking a conference to discuss its contemplated motion to dismiss the Complaint on the basis that Plaintiff's claims were time-barred and that Plaintiff had failed to plead that he was eligible for FMLA leave.  (Dkt. #8).  By letter dated April 29, 2020, Plaintiff made clear his intent to amend his pleadings to address the deficiencies identified in Defendant's pre-motion letter.  (Dkt. #9).  Based on Plaintiff's representation, the Court denied Defendant's request for a conference on its contemplated motion to dismiss.  (Dkt. #10).

On May 1, 2020, Plaintiff filed the First Amended Complaint, which is the operative pleading in this matter.  (Dkt. #11).  Thereafter, on June 18, 2020, the Court endorsed the parties' civil case management plan, which set out the deadlines by which the parties were to complete fact and expert discovery.  (Dkt. #21).  The Court subsequently endorsed the parties' stipulation and protective order regarding the designation and handling of confidential information in this case on September 29, 2020.  (Dkt. #24).

The Court convened the first pretrial conference with the parties on October 20, 2020, at which conference the parties expressed an interest in participating in a settlement conference before a magistrate judge.  (*See* Minute Entry for October 20, 2020).  Accordingly, the Court referred the case to Magistrate Judge Gabriel W. Gorenstein for settlement.  (Dkt. #25).  However,

18

Judge Gorenstein never convened a settlement conference because Defendant filed a letter on November 16, 2020, asking the Court to withdraw its order referring the case to a magistrate judge.  (Dkt. #29).  In this letter, Defendant explained its intent to file a dispositive motion for summary judgment.  (*Id.*).  The Court withdrew the referral order that same day.  (Dkt. #30).

On December 18, 2020, Defendant filed a letter seeking a pre-motion conference regarding its contemplated motion for summary judgment, citing what it claimed to be: (i) Plaintiff's inability to establish his eligibility for FMLA protection; (ii) Plaintiff's failure to make out a *prima facie* case for FMLA interference or retaliation; and (iii) Defendant's legitimate, non-retaliatory reasons for the termination of Plaintiff's employment.  (Dkt. #32).  Plaintiff filed a letter in opposition on December 22, 2020.  (Dkt. #33).  After review of these submissions, on December 23, 2020, the Court dispensed with its requirement that the parties appear for a pre-motion conference and set a briefing schedule for Defendant's motion.  (Dkt. #34).

Defendant filed its notice of motion for summary judgment on March 1, 2021 (Dkt. #37), and its supporting papers on March 2, 2021 (Dkt. #38-41).[12] Plaintiff filed his opposition submission and supporting papers on May 7, 2021.  (Dkt. #49-54).[13]  Defendant filed its reply brief on June 18, 2021.  (Dkt.

---

[12]    Defendant informed the Court that the delay in filing the papers supporting its motion for summary judgment was due to a widespread issue with the Court's electronic case filing ("ECF") system, which issue was not resolved until the day following the deadline for its opening submission.  (Dkt. #42).

[13]    As mentioned *supra* note 11, certain of Plaintiff's exhibits are filed under seal pursuant to the protective order that was entered into in this case.  (Dkt. #24, 52).  These sealed exhibits include the OSI investigatory files concerning the disciplinary allegations

#59-61).  Accordingly, the Court considers Defendant's motion for summary judgment fully briefed and ripe for decision.

## DISCUSSION

### A.    Applicable Law

#### 1.    Summary Judgment Pursuant to Federal Rule of Civil Procedure 56

Pursuant to Federal Rule of Civil Procedure 56, "[a] party may move for summary judgment, identifying each claim or defense — or the part of each claim or defense — on which summary judgment is sought."  Fed. R. Civ. P. 56(a).  A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *Id.*; *see also Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322-23 (1986).[14]  A genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Fireman's Fund Ins. Co.* v. *Great Am. Ins. Co. of N.Y.*, 822 F.3d 620, 631 n.12 (2d Cir. 2016) (internal quotation marks and citation omitted).  A fact is "material" if it "might affect the outcome of the suit under the governing law[.]" *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

---

against Plaintiff, which were designated as "Confidential Materials" under the protective order.  (Dkt. #52).

[14]    The 2010 Amendments to the Federal Rules of Civil Procedure revised the summary judgment standard from a genuine "issue" of material fact to a genuine "dispute" of material fact.  *See* Fed. R. Civ. P. 56, advisory comm. notes (2010 Amendments) (noting that the amendment to "[s]ubdivision (a) ... chang[es] only one word — genuine 'issue' becomes genuine 'dispute.'  'Dispute' better reflects the focus of a summary-judgment determination.").  The Court uses the post-amendment standard, but continues to be guided by pre-amendment Supreme Court and Second Circuit precedent that refer to "genuine issues of material fact."

While the moving party "bears the initial burden of demonstrating 'the absence of a genuine issue of material fact,'" *ICC Chem. Corp.* v. *Nordic Tankers Trading a/s*, 186 F. Supp. 3d 296, 301 (S.D.N.Y. 2016) (quoting *Celotex*, 477 U.S. at 323), the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *accord Brown* v. *Henderson*, 257 F.3d 246, 252 (2d Cir. 2001).  Rather, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial."  *Parks Real Est. Purchasing Grp.* v. *St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 41 (2d Cir. 2006) (quoting Fed. R. Civ. P. 56(e)).

"When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant."  *Dallas Aerospace, Inc.* v. *CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003) (citing *Anderson*, 477 U.S. at 255).  In considering "what may reasonably be inferred" from evidence in the record, however, the court should not accord the non-moving party the benefit of "unreasonable inferences, or inferences at war with undisputed facts."  *Berk* v. *St. Vincent's Hosp. & Med. Ctr.*, 380 F. Supp. 2d 334, 342 (S.D.N.Y. 2005) (quoting *Cnty. of Suffolk* v. *Long Island Lighting Co.*, 907 F.2d 1295, 1318 (2d Cir. 1990)).  Relatedly, "[t]hough [a court] must accept as true the allegations of the party defending against the summary judgment motion, ... conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment."  *Kulak* v. *City of*

*New York*, 88 F.3d 63, 71 (2d Cir. 1996) (internal citation omitted) (citing

*Matsushita*, 475 U.S. at 587; *Wyler* v. *United States*, 725 F.2d 156, 160 (2d Cir.

1983)); *accord Hicks* v. *Baines*, 593 F.3d 159, 166 (2d Cir. 2010).

### 2. The FMLA

The FMLA entitles eligible employees with qualifying reasons to twelve

workweeks of unpaid leave during any twelve-month period.  29 U.S.C.

§ 2612(a)(1).  A need to care for a relative with a "serious health condition" is a

statutorily specified ground for FMLA leave.  *Id.* § 2612(a)(1)(C).  To qualify for

FMLA leave, an employee must have been employed for at least one year by his

current employer and have worked a minimum of 1,250 hours during the

previous twelve-month period.  *Id.* § 2611(2)(A).

"FMLA claims come in at least two varieties: interference and retaliation."

*Woods* v. *START Treatment & Recovery Ctrs., Inc.*, 864 F.3d 158, 166 (2d Cir.

2017) (citation omitted).  "[A]n employee brings an 'interference' claim when her

employer has prevented or otherwise impeded the employee's ability to exercise

rights under the FMLA."  *Id.* (citing *Graziadio* v. *Culinary Inst. of Am.*, 817 F.3d

415, 424 (2d Cir. 2016)).  And an employee may bring a retaliation claim based

on "actually exercising her rights or opposing perceived unlawful conduct

under the FMLA and then being subjected to some adverse employment action

by the employer."  *Id.* (citing *Potenza* v. *City of New York*, 365 F.3d 165, 168 (2d

Cir. 2004) (per curiam)).

"A threshold issue for both FMLA interference claims and FMLA

retaliation claims is whether an employee is eligible under the statute to claim

its protections." *Arroyo-Horne* v. *City of New York*, 831 F. App'x 536, 539 (2d

Cir. 2020) (summary order) (citing *Graziadio*, 817 F.3d at 424; *Potenza*, 365

F.3d at 168); *see also Kim* v. *Goldberg, Weprin, Finkel Goldstein, LLP*, 862 F.

Supp. 2d 311, 318 (S.D.N.Y. 2012) (collecting cases finding that FMLA

eligibility is threshold requirement for FMLA retaliation claim).

**B.   Analysis**

Plaintiff brings claims for FMLA interference and retaliation.  As the

Court will explain in the following section, Plaintiff has failed to establish that

he was eligible for FMLA protection.  Because of his failure to make out a

genuine dispute of material fact on this threshold issue, the Court grants

summary judgment in Defendant's favor as to both claims.

### 1.   Plaintiff Does Not Satisfy the FMLA Eligibility Threshold

Defendant's primary argument on summary judgment is that, despite

DOE's failure to maintain complete and accurate time records, the record

conclusively establishes that Plaintiff could not have worked enough hours to

qualify for FMLA leave during the relevant periods.  (Def. Br. 1).  Plaintiff

disagrees and argues that there exists a genuine dispute of material fact as to

Plaintiff's FMLA eligibility, because Plaintiff has testified that he worked

approximately 1,323 hours during the relevant twelve-month period.  (Pl.

Opp. 11).  The Court concludes that even when drawing all reasonable

inferences in Plaintiff's favor (and, indeed, certain inferences favoring Plaintiff

that are belied by the record), Plaintiff could not possibly have worked the

requisite 1,250 hours during any relevant twelve-month period to satisfy the FMLA eligibility threshold.

### a.    Standards for Determining FMLA Eligibility

In "determining whether an employee meets the hours of service requirement …, the legal standards established under the Fair Labor Standards Act or 'FLSA' shall apply." *Donnelly* v. *Greenburgh Cent. Sch. Dist. No. 7*, 691 F.3d 134, 141 (2d Cir. 2012) (internal alterations omitted) (quoting 29 U.S.C. § 2611(2)(C)).  As pertinent here, the Department of Labor regulations pursuant to the FLSA provide that "[t]he determination of whether an employee meets the hours of service requirement and has been employed by the employer for a total of at least 12 months must be made as of the date the FMLA leave is to start."  29 C.F.R. § 825.110(d).  The regulations also provide that "[b]ona fide meal periods are not worktime."  *Id.* § 785.19.[15]

Where, as here, an employer does not maintain complete records of the hours worked by the employee, "the employer has the burden of showing that the employee has not worked the requisite hours."  29 C.F.R. § 825.110(c)(3).[16] The Second Circuit has clarified that in cases involving inaccurate or incomplete records, "[t]o succeed on a motion for summary judgment, a defendant must show that, in the plaintiff's specific case, either the hours

---

[15]    To qualify as a bona fide meal period, "the employee must be completely relieved from duty for the purposes of eating regular meals.  Ordinarily 30 minutes or more is long enough for a bona fide meal period."  29 C.F.R. § 785.19.

[16]    Defendant concedes that DOE's records do not show the hours and dates that Plaintiff worked from May 9, 2017, until his last day of work at DOE on March 19, 2018.  (Def. Br. 10; *see also* Time and Attendance Records).

alleged could not have occurred or the hours alleged are not compensable as a matter of law 'according to the principles established under the [FLSA].'" *Donneley*, 691 F.3d at 143 (quoting 29 C.F.R. § 825.110(c)(1)). In short, "the burden of proof is squarely on [DOE] to prove that [Plaintiff] did not work 1,250 hours in the year preceding his [request for] leave." *Id.* at 142.

In this case, Plaintiff requested to take FMLA leave twice during his tenure at P.S. 6: once on an unspecified date in mid-February 2018 (Pl. 56.1 ¶ 127), and again on March 19, 2018, his last day of work (*id.* at ¶ 134).[17] On both occasions, Plaintiff intended to take FMLA leave immediately. (Def. 56.1 ¶ 42). Thus, the Court will assess Plaintiff's hours of service during the 12 months preceding both requests (*i.e.*, February 11, 2017, to February 12, 2018; and March 18, 2017, to March 19, 2018) to determine whether Defendant has satisfied its burden of proving that Plaintiff did not satisfy the FMLA eligibility threshold.[18]

### b.   Plaintiff's Calculation of Hours

On Plaintiff's calculation, he worked approximately 1,323 hours during both of the relevant time periods. (Pl. Opp. 11-12; *see also* Pl. 56.1 ¶¶ 89-90). Plaintiff relies exclusively on his own deposition testimony to arrive at this

---

[17]   Plaintiff has not specified the precise date in mid-February 2018 on which he requested to take FMLA leave, and there is nothing in the record suggesting a more precise date. Thus for Plaintiff's benefit, the Court infers, just as the parties have in their briefing, that Plaintiff first requested FMLA leave on the date in mid-February 2018 that maximizes his hours of service. (*See* Def. Br. 10 n.6; *see also* Pl. 56.1 ¶ 89). This date is Monday, February 12, 2018.

[18]   In drawing another inference in Plaintiff's favor, the Court adopts for the purposes of its analysis the two 366-day periods specified by Defendant in its briefing. (*See* Def. Br. 10-12).

estimate.  (Pl. 56.1 ¶¶ 89-90).  At his deposition, Plaintiff testified that, between September 2016 and March 2018, he worked, on average, "[s]ix hours a day, Tuesday through Friday, and seven hours on every Monday."  (Wallace Dep. 65:4-7; *see also* Pl. 56.1 ¶¶ 92, 94, 97).  According to Plaintiff, he maintained this 31-hour workweek throughout his time as a substitute paraprofessional at various schools from 2013 through May 21, 2017; as a paraprofessional at P.S. 20 from May 22, 2017, through the last week of June 2017; and as a paraprofessional at P.S. 6 beginning in the first week of September 2017 through March 19, 2018.  (*Id.* at ¶¶ 91-96).  Plaintiff's estimate of 1,323 hours-of-service rests on the assumption that he worked a consistent average of 31 hours per week, every week, at each school to which he was assigned.  (*See* Pl. 56.1 ¶¶ 89-90).

Therefore, for the twelve-month period running from February 11, 2017, to February 12, 2018, Plaintiff claims to have worked a total of 42.71 weeks — 14.14 weeks as a substitute paraprofessional between February 11, 2017, to May 21, 2017; 5.57 weeks at P.S. 20 from May 22, 2017, to June 30, 2017; and 23 weeks at P.S. 6 from September 4, 2017, to February 12, 2018.  (*Id.* at ¶ 89).[19]  On the assumption that he worked 31 hours per week, every week

---

[19]     Plaintiff erroneously stated in his tabulation of his estimated hours of service during the February timeframe that the number of weeks that he worked at P.S. 20 was 14.14 weeks.  (Pl. 56.1 ¶ 89).  It is unrefuted that Plaintiff worked at P.S. 20 from May 22, 2017, through the end of June 2017.  (Pl. 56.1 ¶ 93).  Assuming that Plaintiff worked through the last day of June 2017, the Court calculated there to be 5 weeks and 4 days between May 22, 2017, and June 30, 2017.  Plaintiff arrived at this same number in his tally of his estimated hours of service for the March timeframe.  There, Plaintiff correctly counts the number of weeks he worked at P.S. 20 as 5.57.  (*Id.* at ¶ 90).  Thus, consistent with Plaintiff's and the Court's own calculations the Court determines that the record reflects that Plaintiff was employed for 5.57 weeks at P.S. 20.

within this timeframe, Plaintiff estimates that he worked for a total of 1323.68 hours between February 11, 2017, and February 12, 2018.[20]

And for the twelve-month period running from March 18, 2017, to March 19, 2018, Plaintiff claims to have worked a total of 42.71 weeks — 9.14 weeks as a substitute paraprofessional from March 18, 2017, to May 21, 2017; 5.57 weeks at P.S. 20 from May 22, 2017, to June 30, 2017; and 28 weeks at P.S. 6 from September 4, 2017, to March 19, 2018.  (*Id.* at ¶ 90).  On the assumption that he worked 31 hours per week, during every week within this timeframe, Plaintiff claims to have worked for a total of 1323.68 hours between March 18, 2017, and March 19, 2018.[21]

### c.   Plaintiff's FMLA Eligibility

Defendant takes issue with Plaintiff's calculations, arguing that they are "based on his own assumptions, incomplete recollections, and inaccurate information[.]"  (Def. Reply 3).  Critically, Defendant argues that Plaintiff's hours-of-service estimates "fail[ ] to account for the days Plaintiff could not have worked during the year given the limited number of school days in the school year, which includes days off for school breaks and holidays."  (*Id.* at 3). Plaintiff rejoins that Defendant's calculations rely on either inadmissible or

---

[20]   The Court's own calculations on these assumptions yield approximately 1324.01 hours. The Court is unable to account for this 0.33-hour difference, but notes its immateriality to any legal conclusion, as both calculations yield numbers comfortably above the FMLA threshold.

[21]   Again, the Court's calculations on these assumptions yield approximately 1324.01 hours.  Here too, the Court is unable to account for this 0.33-hour difference.  It remains the case that both calculations yield numbers above the FMLA threshold. Thus, this fractional discrepancy does not impact any relevant legal conclusion.

27

unreliable evidence to show that Plaintiff was not eligible for FMLA protection. (Pl. Opp. 8-9).  As explained below, the Court agrees with Defendant because even under the most generous set of assumptions reasonably available to Plaintiff, the admissible evidence in the record conclusively establishes that Plaintiff was ineligible for FMLA leave.

To begin, assuming Plaintiff worked every single day he could have been scheduled to work — which Plaintiff concedes he did not (*see, e.g.,* Pl. 56.1 ¶ 47 (admitting that Plaintiff was absent from work on March 16, 2018)) — the record reveals that Plaintiff, at most, could have worked 180 days between February 11, 2017, and February 12, 2018; and 179 days between March 18, 2017, and March 19, 2018.  To arrive at these upper bounds, the Court first credits the portion of Plaintiff's Time and Attendance Records that pre-date his employment at P.S. 6, as this portion of the records contains entries for the days Plaintiff worked between February 1, 2017, and May 8, 2017.[22]  According

---

[22]   Plaintiff urges the Court to disregard the entirety of the Time and Attendance Records, as they allegedly "lack probative value and the typical trustworthiness of business records" because "Ms. Weaver kept records of the absences or lateness of P.S. 6 employees only if the principal or assistant principal directed her to make a record." (Pl. Opp. 9).  On Plaintiff's telling, "whether [Plaintiff] was recorded as absent or late was subject to the whims of the Principal Waters and not actual fact."  (*Id.*).

The Court declines to disregard *in toto* the Time and Attendance records for three reasons.  *First*, Plaintiff's argument as to the unreliability of the Time and Attendance records relates only to the entries corresponding to the period when Plaintiff worked at P.S. 6 (*i.e.*, the first week of September 2017 until March 19, 2018).  As such, even if the Court were to fully accept Plaintiff's argument regarding the unreliability of Ms. Weaver's timekeeping practices, it would not bear on the portion of the Time and Attendance Records documenting the days Plaintiff worked at other schools *prior* to his time at P.S. 6 (*i.e.*, from February 11, 2017, to May 8, 2017).  Relatedly, there is nothing in the record to suggest that Ms. Weaver — or any other P.S. 6 administrator — had timekeeping responsibilities for any school besides P.S. 6, or otherwise had the power to retroactively alter Plaintiff's time records.  Plaintiff's only specific challenge to the reliability of the Time and Attendance records is therefore unrelated to the portion of the records pre-dating his employment at P.S. 6.

to the Time and Attendance Records, Plaintiff worked 46 days between February 11, 2017, and May 8, 2017; and 27 days between March 18, 2017, and May 8, 2017.  (Def. 56.1 ¶¶ 77-78).  To calculate the remaining number of schooldays during the relevant periods, the Court credits the unrefuted Declaration of Principal Waters, which contains her attestation to the number of school days that were not reflected by the Time and Attendance Records.

_____

*Second,* nowhere in the record has Plaintiff alleged that he, in fact, worked on a day between February 11, 2017, and May 8, 2017, that is not reflected in the time records. In disputing the number of days Plaintiff worked between these dates, he relies on his own deposition testimony estimating the number of hours he worked as a substitute paraprofessional.  (*See* Pl. 56.1 ¶¶ 77, 78 (substantiating objection to number of days worked with Wallace Dep. 67:3-10); *see also* Wallace Dep 67:3-10 ("Q: How many hours did you work as a sub-para between September of 2016 and May of 2017?  A: I would say, about a thousand hours.  Q: First, how many hours a day.  A: Six hours a day, seven hours on a Monday.  Q: As a sub-para, you had a regular schedule working five days a week?  A. Yes.")).  Setting aside the fact that the school calendar was such that Plaintiff could not possibly have worked every weekday in this timeframe, Plaintiff did not actually testify that he worked every single day of every single week during this timeframe.  Plaintiff's recollection that he typically worked regular workweeks as a substitute paraprofessional does not call into question any particular entry in the Time and Attendance Records, especially where the records from this period can be read consistently with Plaintiff's generalized testimony regarding his work schedule.

*Third,* Plaintiff misconstrues the record as to the portion of the Time and Attendance Records related to his time at P.S. 6.  Ms. Weaver did not testify that *every* entry she input into the electronic timekeeping system was done so at the order of her superiors. Rather, Ms. Weaver testified that she would only enter a lateness of fewer than 10 minutes when asked by the principal or assistant principal.  (*See* Weaver Dep. 52:8-14 ("Q: Would you enter a lateness for fewer than 10 minutes?  A: If I was told to do so. Q: Who would tell you to do so hypothetically?  A. The principal or the assistant principal.")).  Even assuming, *arguendo,* that Ms. Weaver only recorded staff and employees as late in the timekeeping system when directed to do so by her superiors, the record evidence cited by Plaintiff does not speak to Ms. Weaver's practices regarding any other type of time entry, such as absences or early departures due to illness.  Given that there is corroborating evidence in the record for several of the entries in the records during Plaintiff's time at P.S. 6 (*Compare* Time and Attendance Records TIME000001, *with* November 28, 2017 Letter-to-File (both noting Plaintiff's absences on September 14, 2017; October 16, 2017; October 27, 2017; and October 30, 2017)), the Court declines to disregard fully the records relating to Plaintiff's time at P.S. 6.

Because Plaintiff has not presented any arguments or cited any record evidence that calls into question the portion of Plaintiff's Time and Attendance Records from February 11, 2017, to May 8, 2017, the Court finds that these records accurately reflect the number of days that Plaintiff worked between these dates.

(*See* Williams Decl., Ex. S ("Waters Decl.")).[23]  Based on her knowledge of the New York City public school calendar, Principal Waters avers that there was a total of 134 school days between May 9, 2017, and February 12, 2018; and 152 school days between May 9, 2017, and March 19, 2018.  (Waters Decl. ¶ 8). Combining the relevant portions of the Time and Attendance Records and the Waters Declaration, the maximum number of days that Plaintiff could have worked between February 11, 2017, and February 12, 2018, is 180.  Using the same sources, the maximum number of days that Plaintiff could have worked between March 18, 2018, and March 19, 2018, is 179.

With respect to the number of hours Plaintiff worked per week, Plaintiff bases his calculation on the assumption that he worked, on average, "[s]ix hours a day, Tuesday through Friday, and seven hours on every Monday," for a total of 31 hours per week.  (Wallace Dep. 65:3-7).  The Court uses a more generous weekly average of 34 hours and 15 minutes, which it derives from P.S. 6's Administrative Handbook.  According to the handbook, official school hours were Monday from 8:15 a.m. to 3:55 p.m. (7 hours and 40 minutes); Tuesday from 8:15 a.m. to 3:50 p.m. (7 hours and 35 minutes); and Wednesday through Friday from 8:15 to 2:35 p.m. (6 hours and 20 minutes).

---

[23]     Plaintiff also urges the Court to disregard the Declaration of Principal Waters because the declarant signed the original version of the declaration using an electronic signature, thus rendering it inadmissible.  (Pl. Opp. 8-9).  Even if the Court found this to be a basis to disregard the declaration, Defendant has mooted the issue with its reply submission, which included a version of the declaration with Principal Waters's actual signature.  (*See* Williams Decl., Ex. S).  And because Plaintiff does not assert any substantive objection to the contents of the Waters Declaration, the Court will not disregard the declaration.  (*See* Pl. 56.1 ¶¶ 79-80).

(*See* P.S. 6 Administrative Handbook at HAND000005).  P.S. 6's official schedule amounts to approximately 6 hours and 51 minutes per weekday, or 34 hours and 15 minutes per week.[24]

Employing the foregoing analysis, the Court estimates that even if Plaintiff worked through his 50-minute lunch period every day — which he did not — and even if Plaintiff worked every day that he could have been scheduled — which, again, he did not — he would have worked at most 1,233 hours during the 180 days between February 11, 2017, and February 12, 2018; and 1,226 hours and 9 minutes during the 179 days between March 18, 2017, and March 19, 2018.[25]  These are both short of the 1,250-hour threshold set by the FMLA.  Thus, even drawing several generous inferences in Plaintiff's favor — namely, that he worked on average more hours per week than he claimed, never took his sanctioned lunch break, was never absent from work, and was never late — Plaintiff still falls short of the FMLA's eligibility threshold.

---

[24]    The Court notes that its tabulation of the average number of hours per workday according to P.S. 6's official schedule deviates from Defendant's calculation by one minute per day.  (Def. Br. 11-12).  The Court's calculation is actually slightly more beneficial than Defendant's because Defendant rounded the average workday down to 6 hours and 50 minutes per day.  Significantly, Plaintiff is not eligible under the FMLA, regardless of whether the Court's or Defendant's estimate is used.

[25]    The Court notes that no facet of these calculations relies on the portion of the Time and Attendance Records from Plaintiff's time at P.S. 6, which Plaintiff claims were unduly influenced by school administrators.  (*See* Pl. Opp. 9).  Moreover, the Court's estimates assume that Plaintiff worked on days that he concededly did not work (*see, e.g.*, Pl. 56.1 ¶ 47), as well as on days where Plaintiff's own statements in the record suggest that he was absent or late (*see, e.g.*, November 28, 2017 Letter-to-File DEF000004 (recounting Plaintiff's comment that, "I have had real emergencies and I have been sick and I promise you I will definitely improve my attendance")).  The Court's estimates also overstate Plaintiff's hours-of-service by approximately 50 minutes per day, as they do not account for the daily 50-minute lunch break afforded to paraprofessionals at P.S. 6.  (*See* Def. 56.1 ¶ 9).

## 2. Defendant Is Not Estopped from Challenging Plaintiff's FMLA Eligibility

Plaintiff argues that Defendant should be estopped from challenging his FMLA eligibility because Defendant did not represent in its pleadings or during discovery whether it believed Plaintiff had worked enough hours to be FMLA eligible. (*See* Pl. Opp. 12-15). As the basis for asserting equitable estoppel, Plaintiff argues that Defendant engaged in affirmative misconduct when it denied having knowledge or information sufficient to determine whether Plaintiff worked at least 1,250 hours in a response to Plaintiff's Requests for Admission, despite having an affirmative duty to conduct a reasonable inquiry into the evidence then available to it. (*Id.* at 13-14). Defendant counters that its response was true at the time it was given, did not prejudice Plaintiff, and thus cannot constitute the type of affirmative misconduct necessary to assert equitable estoppel against a government entity. (Def. Reply 4-5). The Court agrees with Defendant.

"The doctrine of equitable estoppel is properly invoked where the enforcement of the rights of one party would work an injustice upon the other party due to the latter's justifiable reliance upon the former's words or conduct." *Kosakow* v. *New Rochelle Radiology Assocs., P.C.*, 274 F.3d 706, 725 (2d Cir. 2001) (citing *In re Ionosphere Clubs, Inc.*, 85 F.3d 992, 999 (2d Cir. 1996)). "Under federal law, a party may be estopped from pursuing a claim or defense where: [i] the party to be estopped makes a misrepresentation of fact to the other party with reason to believe that the other party will rely upon it; [ii] and the other party reasonably relies upon it; [iii] to her detriment." *Id.*

(citation omitted).  However, "it is well settled that the Government may not be estopped on the same terms as any other litigant."  *Heckler* v. *Cmty. Health Servs. of Crawford Cnty., Inc.*, 467 U.S. 51, 60 (1984) (citations omitted).  "Equitable estoppel is available against the government in 'the most serious of circumstances,' and requires 'a showing of affirmative misconduct by the government.'"  *Schwebel* v. *Crandall*, 967 F.3d 96, 103 (2d Cir. 2020) (quoting *Rojas-Reyes* v. *INS*, 235 F.3d 115, 126 (2d Cir. 2000)).[26]

Plaintiff argues that Defendant's current challenge to Plaintiff's FMLA eligibility contradicts its representations in its Answer to the First Amended Complaint and its responses to Plaintiff's Requests for Admission.  (*See* Pl. Opp. 9-11).  On June 1, 2020, in response to Plaintiff's allegations in the First Amended Complaint that he worked at least 1,250 hours during the relevant time periods (*see* Clark Decl., Ex. 1 ("Am. Compl.") at ¶¶ 20-22), Defendant in its Answer "den[ied] knowledge or information sufficient to form a belief as to the truth of the[se] allegations" (*id.*, Ex. 2 ("Answer to the First Amended Complaint") at ¶¶ 20-22).  Similarly, on August 26, 2020, in response to Plaintiff's request that Defendant admit that Plaintiff worked at least 1,250 hours for DOE in the twelve months prior to February 2018, Defendant said

---

[26]     Although the Second Circuit has not expressly applied the doctrine of equitable estoppel against a government entity in an FMLA case, both parties presume in their briefing that the "affirmative misconduct" standard applies to this case.  (*See* Def. Br. 13; Pl. Opp. 13).  At least one other circuit has discussed the weighty issues presented by estopping a government entity in the FMLA context, and explained that "the Supreme Court has almost never estopped the government — outside of criminal cases or deportation."  *Nagle* v. *Acton-Boxborough Reg'l Sch. Dist.*, 576 F.3d 1, 4-6 (1st Cir. 2009).  Here, the Court need not decisively weigh in on the estoppel standard applicable to a government entity on an FMLA claim because Plaintiff has failed to establish a case for estopping even a private litigant.

that it "cannot truthfully admit or deny this request, because defendant is still
in the process of obtaining information concerning the number of hours worked
in the 12 months prior to February 2018." (*Id.*, Ex. 3 ("Defendant's Response
to RFAs") at 5-6).  Defendant furnished an identical response to Plaintiff's
request to admit that Plaintiff worked at least 1,250 in the twelve months
preceding March 2018.  (*See id.* at 6).

Plaintiff argues that Defendant's about-face regarding its lack of
knowledge about Plaintiff's hours-of-service constitutes "affirmative
misconduct," because Defendant's revelation about Plaintiff's FMLA ineligibility
relies entirely on evidence that was available to it at the time it responded to
Plaintiff's Requests for Admission.  (Pl. Opp. 13-14).  This, Plaintiff contends,
evinces Defendant's failure to conduct a reasonable investigation into the
number of hours Plaintiff worked at the time Defendant filed its discovery
responses, in violation of its obligations under Federal Rule of Civil Procedure
36(a)(4).  (*Id.*).  In ostensible reliance on Defendant's stated lack of knowledge of
Plaintiff's hours of service, Plaintiff assumed at the close of discovery that
Defendant would be unable to satisfy its burden of proof on the issue of
Defendant's FMLA eligibility under 29 C.F.R. § 825.110(c)(3).  (*Id.* at 14).
Plaintiff claims that he has been "severely prejudiced" (*id.* at 10) by his reliance
on Defendant's discovery responses, because he was lured into the mistaken
belief that he "did not have a reason to probe further into the question of FMLA
eligibility while discovery was ongoing" (*id.* at 14-15).

34

Plaintiff's arguments to estop Defendant are unavailing.  As the party seeking to invoke equitable estoppel, Plaintiff bears the burden of establishing that Defendant's "misrepresentation of fact" engendered his detrimental reliance.  *Kosakow*, 274 F.3d at 725.  The Court fails to see how, absent any contraindication, Defendant's denial of knowledge of the number of hours that Plaintiff worked during the relevant time periods could constitute a "misrepresentation of fact."  Plaintiff does not contend that Defendant withheld information in discovery regarding the number of hours Plaintiff worked during the relevant timeframes, which is the only fact to which Defendant attested in the challenged statements.  Instead, Plaintiff predicates his estoppel argument on Defendant's alleged failure to sufficiently investigate the evidence in its possession before furnishing its responses to Plaintiff's Requests for Admission. (Pl. Opp. 10, 13-14).  This, alone, is not a "misrepresentation of fact" that can stand as a basis to estop anyone, let alone a government entity.[27]  The Court declines to estop Defendant based on what boils down to Plaintiff's failure to anticipate Defendant's framing of its motion for summary judgment, when all of the relevant discovery materials were equally accessible to both parties.  The Court will not transmute Plaintiff's lament that he did not engage in further discovery into the issue of FMLA eligibility into "affirmative misconduct" or a "misrepresentation of fact" on the part of Defendant.  Accordingly, Defendant is not estopped from contesting Plaintiff's eligibility under the FMLA.

---

[27]    For substantially these same reasons, the Court also declines to find that DOE or its counsel engaged in any "affirmative misconduct" at any stage in the case.

### 3. The Court Grants Summary Judgment in Favor of Defendant as to Plaintiff's FMLA Claims

As previously stated, Plaintiff brings claims for both interference with his rights under the FMLA and retaliation for his attempts to exercise these rights. The Court's finding on Plaintiff's FMLA eligibility is dispositive of both of Plaintiff's claims. *See Ziccarelli* v. *N.Y. Univ. Hosps. Ctr.*, 247 F. Supp. 3d 438, 447 (S.D.N.Y. 2017) (noting that in order to succeed on a claim of FMLA interference, a plaintiff must show, *inter alia*, "that she is an eligible employee under the FMLA" (quoting *Geromanos* v. *Columbia Univ.*, 322 F. Supp. 2d 420, 427 (S.D.N.Y. 2004)); *Wells* v. *Achievement Network*, No. 18 Civ. 6588 (KPF), 2021 WL 810220, at *14 (S.D.N.Y. Mar. 2, 2021) (observing that "proving entitlement to FMLA leave is a necessary prerequisite to a valid FMLA retaliation claim" (citing *Arroyo-Horne*, 831 F. App'x at 539; *Kim*, 862 F. Supp. at 318)). Accordingly, the Court grants summary judgment in Defendant's favor as to both Plaintiff's interference and retaliation claims.

### CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is GRANTED in full. The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

Dated:    December 28, 2021
          New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge